UNITED STATES of America

v.

Susan Viola KLAT, Defendant.

Crim. No. 96–385(RCL).

United States District Court,
District of Columbia.

July 13, 1999.

*MEMORANDUM AND ORDER*

LAMBERTH, District Judge.

This matter comes before the court on remand from the United States Court of Appeals for the District of Columbia Circuit for a further evidentiary hearing and determination. *See United States v.. Klat,* 156 F.3d 1258 (D.C.Cir.1998). After holding that permitting a defendant to appear *pro se* at a competency hearing violates the Sixth Amendment's right-to-counsel provision, the Court of Appeals remanded the case for "an evidentiary hearing to determine whether the competency hearing could have come out differently if . . . the defendant had been represented at the hearing." *Id.* at 1260. Importantly, the Court of Appeals reached this decision notwithstanding defendant's repeated demands that this court observe her constitutional right to represent herself *pro se* as seen in the following passage:

> The Court: The first step is whether you're going to proceed pro se before me. You've been indicted by a grand jury. This is the first I know of this case. I'm going to decide how the case proceeds before me.
>
> Now, you said that Mr. Howard[, appointed counsel,] had been removed from the case. You don't have the power to remove him from the case before—
>
> Ms. Klat: The Sixth Amendment—
>
> The Court: Would you listen—

Ms. Klat:—allows me to represent myself.

The Court: to me? I understand that. And if you'll listen to me, I'll let you speak when I finish speaking.

Ms. Klat: Okay.

The Court: Okay. You don't have the power to remove him from the case. The Court decides that question. You have the power to say you don't want him, and if you don't want him and I go through your rights with you, and I decide that you have the right to represent yourself—

Ms. Klat: Okay. Go ahead. I'm listening.

\* \* \* \* \* \*

The Court: Before I decide whether I'm going to allow [Mr. Howard to withdraw], I want to make sure you understand your rights.

As you just said, you have a right to represent yourself. If I were charged with a serious crime like this, as you are, I would not represent myself. I would want independent advice to assist me. If I find that you're competent, you can make that decision yourself. I must say, I think that people in your situation raise a question about your competence.

\* \* \* \* \* \*

Ms. Klat: I understand what you're saying.... Title 16, Section 1654, appearance personally, states I may represent myself. The Sixth Amendment to the Constitution of the United States allows me to represent myself.

\* \* \* \* \* \*

The Court: I'm not saying you don't know the rules. I'm saying that if I were in your posture—

Ms. Klat: I realize that, but you're not, sir, and I know I can represent myself. I understand and I appreciate your concern, okay? I want that on record. But I also know that I can represent myself competently.

\* \* \* \* \* \*

Ms. Klat: Can I address the preliminary hearings under Federal Rules of Criminal Procedure, 5.1? I would like to do that as well. I know you think I'm rattling on, but I do want a jury to hear this. I think they need to see how this court system is run and how you—you want Mr. Howard to represent me. Mr. Howard informed me that defendants in this country have a 97 percent prosecution rate. Now, you're going to tell me any other profession that is that incompetent at defending people is in my best interest? Okay? Realistically? Okay? Case in point.

Tr. of Arr. Hrg. at 2–9.

The court's ruling today determines whether defendant's conviction must be vacated. If the court finds that counsel could not have changed the outcome of the competency hearing, then vacatur would not be appropriate. If, on the other hand, the court holds that counsel could have affected the competency determination, then vacatur would be required because the constitutional violation would "contaminate the entire criminal proceeding, including defendant's subsequent waiver of her right to counsel at trial and the trial itself." *Id.* at 1264. The court conducted the appropriate evidentiary hearing on April 14, 1999.

After consideration of the arguments and testimony presented at the hearing, the record in this case, the memoranda of the parties, and the legal standard announced by the Court of Appeals, the court finds that defendant's competency hearing could not have "come out differently" had she been represented by counsel. Accordingly, defendant's conviction will not be vacated and, therefore, she will not be afforded a new trial.

I. *Background*

Defendant Susan Klat was convicted by a jury for threatening to assault the Chief Justice of the United States, William Rehnquist, and the Clerk of the United

States Supreme Court, William Suter. Trial Tr. at 397. The circumstances leading to defendant's conviction arise from her history of interaction with the judicial branch.

In August 1992, a California state court awarded custody of defendant's daughter to defendant's mother. Defendant exhausted her right to an appeal at every level and was unsuccessful each time. In September 1995, defendant brought a civil suit against the State of California alleging civil rights violations based upon the transfer of custody of her daughter. This lawsuit was eventually dismissed on Eleventh Amendment immunity grounds.

Defendant then petitioned the United States Supreme Court for a "stay" and for a writ of certiorari. Both requests were denied as of June 1996. In one of defendant's letters to the Court, defendant addressed a letter to "the clerk and Justices of the Supreme Court" that articulated the following thoughts:

> Denying me or anyone else the Constitution's protection while disregarding federal law only demonstrates that this Court lacks the interest and ability to protect all individuals' rights or administer justice in any form. One shouldn't have to resort to creating casualties, such as the Oklahoma bombing, to get your attention. Unfortunately, experience shows that this is the only method that creates change and actually works. The Declaration of Independence distinctly states that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or abolish it. Nowhere in this declaration does it state that corruption is to be tolerated. An eye for an eye may well be the only solution left to justice in this country. The writ will still be written and the story told with the ultimate outcome explained by whoever survives this madness and is left standing.

Trial Tr. at 177.

Subsequent to the denial of her motions, defendant made it known publicly that she planned to move to Washington, D.C. to ensure that her case would be heard by the Supreme Court. According to the government's evidence at trial, defendant stated that she was moving to Washington D.C. "to take care of [her] case." Trial Tr. at 219. Essentially this meant, in defendant's words, that "I'm going to go to the Supreme Court, and if they don't hear my case, I'm going to blow away anybody who stands in my way." Id. Defendant followed through on some of her announced intentions.

On August 12, 1996, defendant left California by car and arrived in Washington, D.C. on August 16, 1996. The very next day, defendant was intercepted at the Supreme Court and interviewed by the FBI. Defendant made several threatening statements similar to those that were made while in California. Although the FBI did not arrest her at that time, defendant was eventually arrested once she enrolled in a firearms training course.

Before her indictment, the government arrested defendant and presented her to a magistrate for a probable cause hearing, where she was represented by court appointed counsel. The magistrate found probable cause to hold defendant and referred her for a competency examination. Tr. of Aug. 30, 1996 Hrg. at 76. This examination was performed by Dr. Bruce Cambosis, who concluded on September 3, 1996 that defendant was competent to stand trial. On the same day, at defendant's detention hearing, the magistrate allowed defendant to be released on personal recognizance. Id. at 8.

Three weeks later, defendant filed a motion requesting that her court-appointed attorney, an Assistant Federal Public Defender, be removed and that she be afforded her constitutional right to represent herself. Defendant's appointed counsel later moved to withdraw because defendant had filed a lawsuit seeking to hold the United States liable for the acts of her

appointed counsel taken in furtherance of his representation of the defendant. The court granted counsel's motion to withdraw, which was raised at defendant's arraignment hearing on November 1, 1996. Tr. of Arr. Hrg. at 17.

The arraignment hearing was this court's first interaction with defendant. Although one expert had already found defendant to be competent to stand trial, the court viewed defendant's behavior at the arraignment hearing and, in an abundance of caution, found reasonable cause to believe that appellant may have been incompetent, thereby triggering a competency evaluation under 18 U.S.C. § 4241(b). Id. at 22. Reasonable cause was provided by what, in the court's layman's opinion, was bizarre behavior. This behavior consisted of a demonstrated unwillingness to show proper respect for the court and counsel when addressing the merits of her case. Put another way, defendant appeared to have an inflated view of the merits of her case, and she did not wish to follow the advice of anyone who challenged its merits or advised defendant of her rights in a manner inconsistent with her own understanding.

Dr. James Shadduck, a forensic psychologist at the Carswell Medical Center in Fort Worth, Texas, where defendant was sent for her examination, performed the competency evaluation ordered by the court. Like Dr. Cambosis before him, Dr. Shadduck found defendant to be competent to stand trial. This determination was made after interviewing defendant five times for a total of approximately ten hours, to which defendant consented. Defendant did not, however, allow Dr. Shadduck to perform two tests—an IQ test and a Multi–Phasic Personality Inventory (MMPI) test. Defendant does not appear to dispute Dr. Shadduck's finding that defendant was of at least average IQ, and this conclusion seems to be unassailable given everything that the court has seen of defendant. Some debate centers around whether Dr. Shadduck's failure to adminis-

ter an MMPI, as a result of defendant's refusal to consent to this test, could have been affected by representation by counsel.

Dr. Shadduck submitted his report to the court on December 16, 1996, three and one-half months after Dr. Cambosis's finding of competency. One month later, the court held a competency hearing, based on the record before the court, at which defendant appeared pro se. The court found that defendant was competent and that she could exercise her right to represent herself for trial. Tr. of Jan. 16, 1997 Hrg. at 14. Defendant did, however accept the court's recommendation that she agree to standby counsel, so long as she could conduct her own defense. Id. at 10–13. No witnesses were called at this hearing, and none were necessary given the two separate expert findings of competency within a three and one-half month period.

After a jury trial in which standby counsel took over the balance of the trial for defendant after the government's first two witnesses, the jury convicted defendant on both counts of the indictment. Before the time of sentencing, at the request of defendant's standby counsel, defendant was again examined by yet another doctor, this time Dr. Thomas Goldman, a psychiatrist. Dr. Goldman found that defendant was not competent to continue representing herself pro se for the purposes of sentencing. Dr. Goldman never stated at any time during this examination period, however, that defendant was in any way incompetent to be sentenced. In fact, Dr. Goldman believed that defendant could return to the community and her job. Dr. Goldman's finding of competency was made in March 1997, six months after Dr. Cambosis's and three months after Dr. Shadduck's findings of competency. On May 27, 1997, defendant was sentenced to incarceration for a period of fifty-seven months.

Given the standard of review announced by the Court of Appeals, as discussed more fully below, it is important to pay particular attention to two points. Each of

these points directly upon the determination of whether counsel could have affected the outcome of the competency hearing.

First, defendant repeatedly demonstrated her total unwillingness to follow advice from others, especially counsel. Defendant was originally appointed counsel from the Federal Public Defender's office, Mr. David Howard. Howard managed to negotiate a diversion for defendant, which would have only required that defendant spend a limited amount of time in a mental health facility, with no jail time involved. Tr. of Apr. 14, 1999 Hrg. at 174. In return for his efforts, defendant later moved to disqualify Howard and, for good measure, sued him personally along with the Federal Public Defender's Office, the Assistant United States Attorney handling the case, the FBI, and two magistrate judges before whom she appeared. *See Klat v. United States,* Case No. 96–2489, Complaint (filed Oct. 30, 1996). Needless to say, defendant disregarded the advice of counsel and refused to accept the diversion offer. At her detention hearing, defendant again ignored the advice of her counsel—this time Ms. Amy Seidman, who was standing in for Howard—and made a statement on her own behalf to the magistrate judge. Tr. of Sept. 12, 1996 Hrg. at 6. At a hearing before this court, contrary to the court's advice, defendant was unwilling to accept anything but standby counsel because, as she articulated, "[t]rust is a very big issue" with her. Transcript of Jan. 16, 1997 Hrg. at 11. When the court attempted to go through the standard procedures of arraigning the defendant and advising her of her rights, defendant threatened to add the court as a defendant to her civil suit. *Id.* at 16. In short, defendant repeatedly articulated her position that she had a Sixth Amendment right to represent herself and that she wished to stand on that right without any interference from counsel. Defendant had her own way of proceeding and could not be persuaded by any

others, including counsel. These facts bear upon the determination of any reasonable possibility of an effect that counsel could have had upon the outcome of the competency hearing.

Second, three separate mental health experts evaluated defendant at three separate times. All three came to the same conclusion of competency to proceed before the court, without exception. Dr. Cambosis examined defendant after her presentment hearing and determined that defendant was competent. Dr. Shadduck examined defendant after her arraignment and reached the same result. Dr. Goldman examined defendant after trial but before sentencing and did not find defendant incompetent to be sentenced.[1] Three independent evaluations, three findings of competency.

To summarize, despite laypersons' observations of defendant's unusual behavior, all experts agreed at all relevant times that defendant was competent in the legal sense of the term. Defendant was totally unwilling to abide by the wishes of appointed counsel or anyone else who attempted to advise her about her case. It is upon these facts that the court must determine whether counsel could have changed the outcome of the court's competency determination.

## II. *Discussion*

### A. *Standard of Review*

■ The parties disagree about the standard of review that this court must apply in light of the Court of Appeals' opinion remanding this case. Both parties concede that the ultimate standard to be applied is whether the competency hearing "could have come out differently if ... the defendant had been represented at the hearing" or in the time period leading up to that hearing. *See Klat,* 156 F.3d at

---

1. Dr. Goldman's examination occurred after the competency hearing and, therefore, is not within the evidence considered under an ap-

plication of the standard announced by the Court of Appeals, at least in any direct sense.

1260 (discussing the competency hearing), 1264 (discussing the time period after arraignment but before the competency hearing). Each side interprets this standard differently, however. The defendant submits that the court must apply a "reasonable possibility" standard—*i.e.*, whether there is a reasonable possibility that counsel could have affected the outcome of the competency hearing. The government implicitly concedes that a reasonable possibility standard applies but contends that "the standard of . . . reasonable possibility is akin to the standard of a 'reasonable probability,'" as that phrase is used in ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The government then leaps to the conclusion that a reasonable probability standard applies.

Defendant clearly has the better argument on this point. The Court of Appeals explicitly stated that the standard it announced for this case was similar to the "reasonable possibility" standard from *United States ex rel. Bilyew v. Franzen*, 686 F.2d 1238, 1245 (7th Cir.1982), and also close to the "reasonable doubts" standard from *McLaughlin v. Royster*, 346 F.Supp. 297, 310 (E.D.Va.1972). The Court of Appeals never referenced a reasonable probability standard. Further, a reasonable probability standard is no more akin to a reasonable possibility standard than a clear-and-convincing standard is akin to a preponderance of the evidence standard. The distinctions between the two make the differences. In short, the Court of Appeals was reasonably clear that it intended a reasonable possibility standard to be used. Consequently, this court must apply that standard.

A reasonable possibility standard, of course, is not tantamount to an "any possibility" standard. If the issue to be determined were whether there is any possibility that counsel could have affected the outcome of the competency hearing, then presumably there would be no need for a further evidentiary hearing and the Court of Appeals would have, itself, vacated defendant's conviction. No evidentiary hearing would be needed because evidence would be useless. Without some reasonableness limitation, which defendant readily adopts in this case, any number of remotely possible inferences could be strung together to lead to nearly any hypothetical effect on the competency hearing.[2]

In conclusion, the court will review the relevant facts in light of the standard urged by defendant: whether there is a reasonable possibility that defendant's competency hearing could have "come out differently" had defendant been represented by counsel during the time period from her arraignment through the competency hearing. The court finds that, on the facts of this case, it is not reasonably possible that counsel could have changed the outcome of the competency hearing.

### B. *Effect of Counsel Determination*

 Defendant advances five arguments for how it is reasonably possible that counsel could have affected the outcome of the competency hearing. In her view, counsel could have: "(1) presented his or her own observations regarding [defendant's] understanding of the proceedings and her ability to assist counsel; (2) advised [defendant] to participate more fully in the psychological evaluation; (3) challenged the findings [of] Dr. James A. Shadduck; . . . (4) retained an independent expert to examine [defendant]"; or (5) "advised [defendant] not to waive her right to an attorney." Defendant's Mem. at 4, 22. All of these arguments fail on the evidence presented in this case.

**2.** Moreover, it is important to note that the Court of Appeals explicitly instructed this court not to attempt to make a competency determination in hindsight. Evidence of defendant's competency or incompetency postdating the competency hearing is therefore irrelevant except to the extent that it may bear upon whether counsel could have affected the outcome of the original competency hearing.

First, it is not reasonably possible that counsel could have affected the outcome of the competency hearing had he or she been allowed to present his or her own observations about defendant's behavior. At the outset, it should be noted that an opportunity for such commentary by counsel was afforded at defendant's presentment to the magistrate. On that occasion, however, the presence of counsel did not alter the magistrate's finding of competency. As noted above, defendant was represented by Mr. Howard at her presentment. The magistrate referred defendant for a psychiatric examination. Dr. Cambosis found defendant to be competent. Counsel for defendant did not offer any observations at that time, despite having the opportunity to do so. Thus, as a practical matter, defendant was given the opportunity for commentary by counsel once already with no change in result. More importantly, the observations that defendant contends counsel could have given the court could not have changed the outcome of the competency hearing. Defendant bases her argument on Howard's observations between the time of presentment (when he was appointed) and arraignment (when he was allowed to withdraw as a result of being sued by his client). Defendant speculates that her condition "did not change," however, between the time of presentment and the competency hearing.[3] Defendant's Mem. at 6. Defendant specifically cites for support Howard's "doubts" about defendant's competency, his observations that defendant had a distorted notion of the merits of her case, and his view that defendant was insufficiently responsive to his questions. The effect of these observations on the court would have been inconsequential. The court had already observed these very issues for itself at the arraignment and competency hearings. These very observations led the court to find that defendant should be referred for a psychiatric evaluation. Dr. Shadduck, like Dr. Cambosis before him, also observed this type of behavior and found defendant to be competent. The court has been given no credible basis to doubt those findings. In short, counsel's observations would have been cumulative in light of this court's own interactions with defendant. Therefore, there is no reasonable possibility that the addition of counsel's personal observations, which had already been personally observed by the court, could have changed the outcome of the competency hearing.

Second, it is not reasonably possible that counsel could have affected the outcome of the competency hearing had he or she advised defendant to participate in further psychological testing. Simply put, there is absolutely no evidence to give rise to the inference of a reasonable possibility that defendant would have acted in accordance with such advice. As described in detail above, defendant consistently refused to follow legal advice from anyone who attempted to offer it. Defendant refused to take Howard's advice as to accepting the government's diversion offer. Defendant refused to take Seidman's advice not to make a statement directly to the magistrate. Defendant refused to take this court's advice in not representing herself *pro se* in this matter. These examples merely highlight the recurring theme in this case—defendant was determined to follow her own approach, not one recommended to her by others more experienced in the legal field. Defendant offers no evidence to controvert the conclusion that defendant would not have taken counsel's advice as to participating in further mental health examinations. Defendant did not offer any testimony, for example, from standby counsel Haldane on this point. To say that there is a reasonable possibility of defendant acting in accordance with the advice of counsel as to further psychological testing is pure speculation and runs

---

**3.** If this speculation—that defendant's mental condition did not change between presentment and the competency hearing—could be substantiated, then it would only bolster the effect of Dr. Cambosis's finding of competency.

contrary to the entire record of defendant's behavior. Accordingly, defendant's argument on this point fails.

Third, it is not reasonably possible that counsel could have affected the outcome of the competency hearing had he or she been able to challenge the findings of Dr. Shadduck. The exact basis for rejecting this argument depends on how many inferences defendant chooses to stack upon one another. Taking a narrow view, the entire argument is flawed because there was no live testimony to cross-examine at defendant's competency hearing. So, defendant's argument presupposes that counsel could have undermined Dr. Shadduck's opinion through a means that was not available as the case in fact proceeded. Taking a broader view, re-writing history to presume a forum in which Dr. Shadduck could be cross-examined, the court finds that there is no reasonable possibility that any amount of cross-examination could have changed the court's opinion of defendant's competency. Defendant essentially challenges Dr. Shadduck's conclusion with the argument that the facts before him should have led to the opposite conclusion. Defendant's counsel, a layperson, asserts that the evidence shows that defendant's view of her case was "irrational" and, therefore, defendant could have been found incompetent after cross-examination. Defendant's Mem. at 11. Given the court's choice between following two experts' findings of competency versus relying upon a counsel's opinion that his or her client has grandiose expectations of victory, there is no reasonable possibility that the court would have followed the latter. Two experts said that defendant was competent. Defendant has provided no basis for the assertion that counsel's cross-examination could have changed the court's reliance on those opinions. Consequently, defendant's argument on this point fails.

Fourth, it is not reasonably possible that counsel could have affected the outcome of the competency hearing had she been allowed to retain an expert to further examine defendant. Defendant's argument again loses sight of practical reality and places speculation and inference in its stead. Her contention rests upon the assumption that "a lawyer for [defendant] could have obtained an independent expert." Defendant's Mem. at 14. Defendant was proceeding *in forma pauperis*, which is why counsel for the Federal Public Defender's Office was appointed to represent her originally. To hire an additional independent expert—*i.e.*, beyond Shadduck and Cambosis—defendant would have had to seek authorization from the court for the expenditure. Defendant provides no basis for the assumption that the court would have been at all inclined to allow a third (at that time) expert to examine defendant, given two previous independent experts' reliable findings of competency within three and one-half months.[4] The court finds no reasonable possibility that it would have approved the hiring of another independent expert. Therefore, defendant's argument on this point is rejected.

Fifth, it is not reasonably possible that counsel could have affected the outcome of the competency hearing by advising defendant not to proceed *pro se*. The court emphasized the inadvisability of a criminal defendant representing herself. *See* Tr. of Arr. Hrg. at 4. The court even explained to defendant that, given the specific circumstances of her case, proceeding *pro se* was especially imprudent. *Id.* Nonetheless, as she had done at nearly every other juncture, defendant listened to the advice being given and rejected it. Defendant went

---

4. The court did allow trial standby counsel Haldane to hire another doctor to examine defendant after her conviction. In that instance, as opposed to the current one, there was a cognizable basis for further testing—defendant had decided to go on a hunger strike at the D.C. Jail. The new doctor, Dr. Goldman, found that defendant was not competent to proceed *pro se* but never found that she was not competent to proceed to sentencing.

to great lengths to dispose of the counsel she had, who had negotiated a diversion. There is no basis to sustain a finding that additional counsel would have had more success. Accordingly, the court rejects defendant's argument.

For these reasons, defendant's arguments all fail. Consequently, defendant will not be affording a new trial.

III. *Conclusion*

For the reasons given above, the court HEREBY FINDS that, in light of the arguments advanced by defendant's counsel, there is no reasonable possibility that counsel could have affected the outcome of defendant's competency hearing. There being no reason to modify or vacate her conviction, defendant shall continue to serve her term of incarceration pursuant to the terms of the prior judgment and commitment order.

SO ORDERED.